18h 595
L-ed 518
19h 563
19h 604
1wa393
101 129
107 85
36f 835
145 423
147 653

WILLIAM C. PEASE, PLAINTIFF IN ERROR, v. JOHN PECK, SURVIV-
ING PARTNER OF THE FIRM OF PECK AND WALTON.

Where a law, as published, has been acknowledged by the people and received a har-
monious interpretation for a long series of years, the propriety may well be doubted
of referring to an ancient manuscript to show that the law as published was not an
exact copy of the original manuscript.

Moreover, in this case, a subsequent legislative authority sanctioned the law as pre-
viously published, and thereby adopted it as a future rule.

The original manuscript of the laws for the territory of Michigan left out the saving
of "beyond seas" in the statute of limitations, but the published law contained this
exception. It ought now to be considered as included.

As a general rule, this court adopts the construction which state courts put upon
state laws. But there are exceptions. Some of these exceptions stated.

THIS case was brought up by writ of error for the circuit court
of the United States for the district of Michigan.

The case is stated in the opinion of the court.

It was argued by *Mr. Lawrence*, for the plaintiff in error,
adopting also an argument filed by *Mr. Emmons* and *Mr. Grey;*
and for the defendant in error by *Mr. Badger*, upon a brief filed
by himself and *Mr. Carlisle.*

Mr. Justice GRIER delivered the opinion of the court.

Peck the plaintiff below, declared against Pease in an action
of debt on a judgment obtained in the circuit court of the terri-
tory (now State) of Michigan, at the term of January, 1836.
The defendant pleaded the statute of limitations of eight years;
to which the plaintiff replied that he did not at any time reside
in the State of Michigan, but in parts "beyond seas," to wit,
in the State of New York.

The defendant demurred to the replication.

The objection to this replication is not to the construction of
the statute which is assumed by the plaintiff to govern the case,
or an allegation that, according to the settled construction of the
word "beyond seas," the replication is defective. But it is in-
tended to deny that the statute of limitations pleaded has any
such provision in it. The question is, therefore, not what is the
construction of an admitted statute, but what is the statute.
For each party admits that if the statute be as claimed by his
opponent, his construction of it is correct.

By the ordinance of 1787, "for the government of the territory
of the United States northwest of the River Ohio," it is provided
"that the governor and judges, or a majority of them shall
adopt and publish in the district such laws of the original States,
criminal and civil, as may be necessary and best suited to the
circumstances of the district, and report them to congress from
time to time, which laws shall be in force in the district until

the organization of the general assembly therein, unless disapproved of by congress; but afterwards the legislature shall have authority to alter them, as they shall see fit."

By an act of congress of 24th April, 1820, 3 Stats. at Large, 565, the laws of Michigan territory in force, were ordered to be printed under the direction of the secretary of state, and a competent number distributed to the people of said territory.

In the volume of the laws so published by authority in that year, is a statute of limitations, which the governor and judges certify to have been "adopted from the laws of the State of Vermont, as far as necessary and suitable to the circumstances of the territory of Michigan."

The eighth section of this act provides that "actions of debt or *scire facias* on judgment must be brought within eight years after the rendition of the judgment, &c."

The 10th section enacts that "this act shall not extend to bar any infant, *feme covert*, person imprisoned, or beyond seas, or without the United States, or *non compos mentis*, &c."

On the 21st of April, 1825, the legislature of the territory, which had been now organized, appointed certain individuals to revise the laws of the territory. They were required "to examine all the laws then in force, to revise, consolidate, and digest them, making such alterations or additions as they may deem expedient."

On the 27th of December, 1826, the commissioners report to the legislature the statutes as revised by them, stating that considerable alterations and some additions had been made by them. These laws received the sanction of the legislature, and were published by authority, in 1827. By this it appears that they adopted the statute of limitations, and the 10th section thereof, from the published acts of 1820, and as stated above. Again, in 1833, "the laws of the territory of Michigan were condensed, arranged, and passed by the fifth legislative council," and were again published under authority of the legislature. The 10th section is again stated in the same words.

The law, as thus published, has been acknowledged by the people and the courts, and received a harmonious interpretation for thirty years. But it has lately been discovered that the text or original manuscript adopted by the governor and judges in 1820, differs from the printed statutes, as published by authority, as to the words of this 10th section. It reads as follows: "Persons imprisoned or without the United States,"—having the words "beyond seas" erased; whereas the printed statutes retain the words "beyond seas," and add or interpolate the word "or."

It is no doubt true, as a general rule, that the mistake of a

transcriber or printer cannot change the law; and that when the statutes published by authority are found to differ from the original on file among the public archives, that the courts will receive the latter as containing the expressed will of the legislature in preference to the former. Yet, as the people who are governed by the laws, and the courts who administer them, practically know the law only from the authorized publication of them, the propriety of recurring to ancient, altered, and erased manuscripts, for the purpose of changing their construction after a lapse of thirty years, and after their construction has been long settled by the courts, and has entered as an element into the contracts and business of the citizens, may well be doubted. The reception and long acquiescence in them, as printed and distributed by authority, by those who had it always in their power to alter or annul them, and did not, may justly be treated as a ratification of them in that form by the sovereign people. The maxim *communis error facit jus*, though said to be dangerous in its application, " because it sets up a misconception of the law, for destruction of the law," might here find a safe and proper application, and make it one of the " some cases" in which it is said the law so favors the public good, that it will permit a common error to pass for right. Noy's Maxims, 37, 4 Inst. 240.

But we need not have recourse to any doubtful speculations in order to arrive at a satisfactory solution of this question. The laws reported by the governor and judges were intended to be temporary, and to remain in force only till the territory should be fully organized, as provided by the ordinance. After such organization, "the legislature is authorized to alter them as they see fit." Accordingly, when the territory of Michigan was so organized, by the election of such council, legislature, or "general assembly," they proceeded at once to have a code or digest of the laws reported for the future government of the territory, and they adopt, reject, alter, and add to, the former laws "as they saw fit." After the promulgation of their code, that of the governor and judges is entirely supplanted, and has no longer any force or effect whatever. Those who look for the rule of action which is to govern them, seek it no longer in the code which has been abrogated, and, having effected its temporary purpose, has become obsolete and null, but in that which has the sanction of their own legislature. The declaration of the legislative will is to be sought from documents originating with them, or published by their sanction. The original documents reported by the judges may be the best evidence of what statutes they intended temporarily to adopt, and what was their will and intention, but cannot be received as any evidence of the will and intention of a legislature ordaining a new and permanent

system of laws under powers delegated to them by congress and the people of the territory. It may well be presumed, that the legislature had no knowledge of this newly discovered erasure in the original, and supposed interpolation in the printed copy of the laws, reported by the judges in 1820; and that they adopted the law as they found it in the copy—printed by authority, and "distributed to the people of the territory." They certainly had power to do so, and having done so, it would be folly to say that they intended to adopt some other words as the expression of their will, to be found only in a document reposing in the crypts of the secretary's office, and which they had probably never seen. But if we assume that they had seen this document, and were aware of its discrepancy from the published law, then their adoption of the latter would be conclusive. On either hypothesis this original document can furnish no evidence of the intention or will of the legislature. It must be remembered that there is no allegation or pretence, that the acts published by authority of the legislature differ from the original reported to them and adopted by them.

That is the only original, if there be any such in existence, by which the printed copy could be corrected, or amended. But to correct or amend the declared will of the legislature, as published under their authority, by the words of a document which did not emanate from them, which it is most probable they never saw, or if seen, they did not see fit to adopt where it differed from the published statutes, would be, in our opinion, judicial legislation, and arbitrary assumption.

The only argument which has been urged, which could lead us to doubt the justness of this conclusion is, that the supreme court of Michigan have, it is said, come to a different decision on this question. We entertain the highest respect for that learned court, and in any question affecting the construction of their own laws, where we entertained any doubt, would be glad to be relieved from doubt and responsibility by reposing on their decision. There are, it is true, many *dicta* to be found in our decisions, averring that the courts of the United States are bound to follow the decisions of the state courts on the construction of their own laws. But although this may be a correct, yet a rather strong expression of a general rule, it cannot be received as the enunciation of a maxim of universal application. Accordingly, our reports furnish many cases of exceptions to it. In all cases where there is a settled construction of the laws of a State, by its highest judicature, established by admitted precedent, it is the practice of the courts of the United States to receive and adopt it without criticism or further inquiry. But when this court have first decided a question

arising under state laws, we do not feel bound to surrender our convictions, on account of a contrary subsequent decision of a state court, as in the case of Rowan v. Runnels, 5 How. 139. When the decisions of the state court are not consistent, we do not feel bound to follow the last, if it is contrary to our own convictions—and much more is this the case, where, after a long course of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines, subversive of former safe precedent. Cases may exist also, when a cause is got up in a state court for the very purpose of anticipating our decision of a question known to be pending in this court. Nor do we feel bound in any case in which a point is first raised in the courts of the United States, and has been decided in a circuit court, to reverse that decision contrary to our own convictions, in order to conform to a state decision made in the mean time. Such decisions have not the character of established precedent declarative of the settled law of a State.

Parties who, by the constitution and laws of the United States, have a right to have their controversies decided in their tribunals, have a right to demand the unbiased judgment of the court. The theory upon which jurisdiction is conferred on the courts of the United States, in controversies between citizens of different States, has its foundation in the supposition that, possibly, the state tribunal might not be impartial between their own citizens and foreigners.

The question presented in the present case is one in which the interests of citizens of other States, come directly in conflict with those of the citizens of Michigan. The territorial law in question had been received and acted upon for thirty years, in the words of the published statute. It had received a settled construction by the courts of the United States as well as those of the State. It had entered as an element into the contracts and business of men. On a sudden, a manuscript statute differing from the known public law, is disinterred from the lumber room of obsolete documents; a new law is promulgated by judicial construction, which, by retroaction, destroys vested rights of property of citizens of other States, while it protects the citizens of Michigan from the payment of admitted debts.

We think that such a case peculiarly calls upon us not to surrender our clear convictions and unbiased judgment to the authority of the new state decision, and to render a judgment in favor of the plaintiff, which we do by affirming the judgment of the circuit court.

Mr. Justice DANIEL and Mr. Justice CAMPBELL dissented.

Mr. Justice CAMPBELL, dissenting.

The decision of this case depends upon the following facts. The territorial government of Michigan was organized under the ordinance of 1787, for the government of the Northwest Territory. The governor and judges of that territory "were authorized to adopt and publish such of the laws of the original States, criminal and civil, as may be necessary and best suited to the circumstances of the territory, and report them to congress from time to time; which laws shall remain in force until the organization of the general assembly therein, unless disapproved by congress. In 1820, the statute of limitations of Vermont was adopted by the council. That statute contains an exception which reads, "persons imprisoned, or beyond seas, without the United States."

The copy filed by the judges, and now found in the archives of Michigan, reads, "persons imprisoned or without the United States," the words "beyond seas" being erased in that copy. It is apparent that the two statutes are to the same effect.

The copy, as it is now found in the archives of Michigan, was reported to congress. The printed publication of the laws was as follows: "persons imprisoned or beyond seas, or without the United States." This error has been continued through the various publications of the laws of Michigan until the present time. But I have not been able to find that the statute, as published, has ever received the sanction of the legislative department of the government. The act, in the various reports and references of the legislature, has been described as an act of a particular title, or as included in the general term of "laws in force," without identifying it as the act published in any of the compilations which have been circulated through the State. I have no evidence of any series of decisions of the courts of Michigan on this subject; none was produced on the argument; and the public opinion that may exist in Michigan as to what makes its statute law, must be a most fallible rule of judgment. The statute laws of a State exist in a permanent form, and are unchangeable, except by public authority, and are not to be ascertained from any popular impression on the subject. If any mischief has arisen from the vicious publications, it belongs to the legislative authority of the State to afford the indemnity. It is admitted that the statute, as contained in the original roll, will bar the plaintiff's claim, and that he is within the exception contained in the printed laws. The question for the court is, what is the evidence on which it should depend to prove the existence of the statute of a State? The act of congress of the 26th of May, 1790, to prescribe the mode in which the public acts, records, and judicial proceedings, in each State shall be authenticated, so as to take effect in every other State, provides,

"that the acts of the legislatures of the several States shall be authenticated by having the seal of their respective States affixed thereto," 1 Stats. at Large, 122.

This court, in the United States v. Amedy, 11 Wheat. 392, said, "no other or further formality is required; and the seal itself is supposed to import perfect verity. In Patterson v. Winn, 5 Pet. 233, the court said of the exemplification of a grant, that it is admissible in evidence, as being record proof of as high nature as the original. It is a recognition, in the most solemn form, by the government itself, of the validity of its own grant, under its own seal, and imports absolute verity as matter of record." We have before us an exemplified copy of the act of Michigan, and from that evidence we learn what is preserved in her archives as the act adopted by the governor and judges in 1820, and referred to in the subsequent reports and acts of her legislature as " An act for the limitation of suits on penal statutes, criminal prosecutions, and actions at law, adopted May 15, 1820.

The authorities are explicit to the effect that this evidence is the highest that can be offered of a statute. That the seal of the State, when properly affixed, is conclusive evidence of the existence of a statute, is the result of several state authorities. United States v. Johns, 4 Dall. 412; Henthorn v. Doe, 1 Blackf. 157; State v. Carr, 5 N. H. 367. The supreme court of Michigan have had this subject under consideration, and after repeated arguments and great deliberation, have decided that this printed statute does not form a part of the laws of that State, but that the original roll must be received as the exact record of the legislative will. The question is so entirely of a domestic character, and belongs so particularly to the constituted authorities of the State to determine, that I cannot bring myself to oppose their conclusion on the subject.

In my opinion the judgment of the circuit court is erroneous, and should be reversed.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Michigan, and was argued by counsel; on consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said circuit court in this cause be and the same is hereby affirmed, with costs and interests, until paid, at the same rate per annum that similar judgments bear in the courts of the State of Michigan.

Mr. Justice CAMPBELL and Mr. Justice DANIEL dissenting.