IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 18, 2008

Charles R. Fulbruge III
Clerk

No. 07-30201

LISA MARIE GINTER, on behalf of her minor child, Rachel Elizabeth Ballard; PAUL EDWARD GINTER

Plaintiffs - Appellees

v.

BELCHER, PRENDERGAST & LAPORTE; FRED H BELCHER, JR

Defendants - Appellants

Appeal from the United States District Court
for the Middle District of Louisiana

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

REAVLEY, Circuit Judge:

Paul and Lisa Ginter, husband and wife, hired Fred Belcher (an attorney) to help guide them through Louisiana's complicated process for adopting a child. The attorney-client agreement memorializing Belcher's representation contained a forum-selection clause requiring that any suit related to the contract be filed in Louisiana state court. After a dispute arose between the parties, however, the Ginters filed suit in federal court. Belcher moved to have the case dismissed, citing the forum-selection clause. The district court held that the clause was unenforceable and certified the decision for interlocutory appeal under 28 U.S.C. § 1292(b). We accepted the appeal and now enforce the forum-selection clause.

I.    Background

The Ginters, residents of South Carolina, hired Belcher—a family law attorney at Belcher, Prendergast & Laporte in Louisiana—to assist them in the adoption of a child.  Later, the Ginters adopted a second child and Belcher again represented them.  With respect to the second adoption, the agreement between the Ginters and Belcher contained a choice-of-law provision (Louisiana law would govern) and a choice-of-forum provision ("Any action at law, suit in equity, or other judicial proceeding for the enforcement and/or breach of this contract, or any provision thereof, shall be instituted only in the 19th Judicial District Court of the State of Louisiana.").  Belcher did not suggest to the Ginters that they seek independent counsel to review the fee agreement.  The Ginters, however, did have the opportunity to ask questions.

The Ginters filed this suit against Belcher and his law firm in federal district court in Louisiana after it was determined the second child suffered from fetal alcohol syndrome because of the birth mother's use of illegal drugs and alcohol.  The Ginters alleged that Belcher had made misrepresentations (both negligent and intentional) about the health of the birth mother and that he had breached his fiduciary duty to them by failing to thoroughly investigate the mother's health.

Belcher responded by filing a motion to dismiss.  He argued, among other things, that the choice-of-forum clause in the attorney-client agreement required the Ginters to file suit in the "19th Judicial District Court of the State of Louisiana," not federal court, as the Ginters had done.  The district court denied the motion.

II.    Discussion

Our only issue is whether the forum-selection clause in the attorney-client agreement between the Ginters and Belcher is enforceable and requires this suit to be dismissed.  We review the district court's decision to enforce the forum-

selection clause de novo. Haynsworth v. The Corp.[1] We hold that the forum-selection clause is enforceable and that the motion to dismiss should have been granted.

We begin with federal law, not state law, to determine the enforceability of a forum-selection clause.[2] Under federal law, forum-selection clauses are presumed enforceable, and the party resisting enforcement bears a "'heavy burden of proof.'"[3] In cases such as this one, where a litigant in federal court attempts to have a case dismissed based on a contractual provision requiring suit to be filed in state court, the forum-selection clause should be upheld unless the party opposing its enforcement can show that the clause is unreasonable.[4] The clause might be unreasonable when, among other things, its inclusion is the product of "overreaching" or when its enforcement would "contravene a strong public policy of the forum state."[5] If the contractual forum-selection clause is not unreasonable, we must determine whether it covers the tort claims at issue in this case. Marinechance Shipping LTD. v. Sebastian.[6]

A.     Is the forum-selection clause enforceable?

Two different reasons have been offered to rebut the presumption that the forum-selection clause here is enforceable—that it was the result of overreaching and that it is against Louisiana public policy. We address each in turn.

The district court invalidated the forum-selection clause because it

---

[1] 121 F.3d 956, 961 (5th Cir. 1997).

[2] Id. at 962.

[3] Id. at 963 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 17, 92 S. Ct. 1907, 1917 (1972)).

[4] Id. at 962–63 (citing Int'l Software Sys. v. Amplicon, Inc., 77 F.3d 112, 114–15 (5th Cir. 1996)).

[5] Id. at 963.

[6] 143 F.3d 216, 222–23 (5th Cir. 1998).

determined that it was the result of overreaching. The court reasoned that the agreement at issue consummated a "business transaction" between the parties and therefore, Belcher—as an attorney—had a professional obligation to advise the Ginters that they should seek independent counsel. Because Belcher did not do that, the district court held that the forum-selection clause was the result of overreaching. To support its conclusion, the district court relied on Louisiana State Bar Association v. Bosworth, where the Louisiana Supreme Court upheld the suspension of an attorney who had entered into a loan agreement with a current client without advising the client to seek independent counsel.[7] According to the court, "[w]hen a lawyer enters into a business transaction with his client where they have differing interests and when the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer should at least advise the client to seek outside counsel."[8]

But the agreement at issue in this case is not a separate "business transaction" between an attorney and client requiring application of the business-transaction rules; instead, all parties agree that it is merely an agreement consummating the attorney-client relationship.[9] The Ginters had no reason to believe that Belcher was using his professional judgment to zealously protect their interests in the very agreement that memorialized their relationship. They might as well ague that Belcher had to look after their

---

[7] 481 So. 2d 567, 571–72 (La. 1986).

[8] Id. at 572.

[9] In dissent, Judge Dennis contends that the contract could be viewed as a hybrid between an attorney-client agreement and a business transaction. But the Ginters have consistently characterized this agreement as nothing more than an attorney-client agreement; indeed, at oral argument, the Ginters' attorney expressly rejected the idea that this agreement consummated anything more than an attorney-client relationship. We will not construe the facts in such a way as to contradict the Ginters view of the facts.

interests in determining how much he should be paid. Belcher did not overreach by failing to advise the Ginters that they should seek independent legal counsel before signing the attorney-client agreement.

The Ginters argue that even if the forum-selection clause was not the result of overreaching, it is unenforceable because it violates Louisiana public policy. The Ginters contend that the clause is a limitation on Belcher's malpractice liability, and Louisiana forbids its lawyers from entering into such agreements "unless the client is independently represented in making the agreement."[10] Here, the Ginters were not separately represented, so if a forum-selection clause is a limitation on malpractice liability, it would be unenforceable as a violation of Louisiana public policy. We do not see this forum-selection clause as a limitation on malpractice liability.

The thrust of the Ginters' argument is that a forum-selection clause limits Belcher's liability because it forces the Ginters to litigate in a forum favorable to Belcher. The clause, if enforced, would require the Ginters—out-of-state plaintiffs—to file suit in Louisiana state court against a Louisiana attorney. The Ginters contend that as out-of-state plaintiffs they would be at a disadvantage to Belcher in Louisiana state court. Indeed, the need for diversity jurisdiction rests, in part, on the recognition that a "state tribunal might not be impartial between [its] own citizens" and citizens of another state.[11] The potential advantage to Belcher is underscored by the fact that he is a local attorney. Thus, the Ginters argue, they are less likely to recover in state court, and Belcher's attempt to have this case litigated in state court is therefore a limitation on his malpractice liability.

---

[10] La Rules of Prof'l Conduct 1.8(h)(1) (stating that a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement").

[11] Pease v. Peck, 59 U.S. 595, 599 (1855).

Louisiana law is silent on the contours of what constitutes limiting malpractice liability. Nevertheless, we have some conceptual difficulty in stretching the concept of limiting liability to cover situations where an attorney selects a forum where he or she might have some conceivable advantage. Our skepticism is supported by examining how other jurisdictions have handled a related issue: whether including mandatory-arbitration provisions (a type of forum-selection clause) in an attorney-client agreement is a form of limiting malpractice liability. While no Louisiana authority has addressed this issue, we find Maine's treatment instructive. Maine's Professional Ethics Commission, in opining that attorneys may include arbitration provisions in their fee contracts without running afoul of their obligation not to include limitations on their malpractice liability, stated the following:

> An agreement to limit liability is, in substance, an agreement that says that even though the lawyer errs in fulfilling certain duties to the client, the lawyer will not be liable to the extent that common and statutory law would otherwise make the lawyer liable. Perhaps if a particular forum had rules that themselves limited liability, then selection of such a forum could fairly be said to limit liability indirectly. Or if the arbitration agreement were a sham, such as an agreement to arbitrate before the lawyer's partner, then one could argue that its practical effect was to limit liability.[12]

Three members of the Commission dissented, arguing that arbitration provided subtle advantages to an attorney, "which potentially limit the attorney's liability for malpractice . . . ."[13]

We find the majority's reasoning persuasive and believe Louisiana courts would as well. A mandatory-arbitration clause (or any forum-selection clause) might in a particular case give the lawyer an advantage over the client. But a clause that has only the possibility of reducing by some small percent the

---

[12] MAINE PROF'L ETHICS COMM'N, Op. 170 (1999).

[13] Id.

chances of an attorney's being found liable is categorically different from a clause that truly limits liability—for example, a clause that either directly limits liability (e.g., a hold-harmless clause) or a clause that so handicaps a client in a malpractice suit as to be a practical limitation on liability (e.g., a clause requiring suit to be filed within days of the malpractice's occurring). Other jurisdictions have recognized that requiring a client to arbitrate is not per se a limitation on liability because requiring arbitration does nothing more than set the litigation arena. Connecticut, for example, has stated that an "arbitration clause addresses only the forum for adjudication of a malpractice claim[] and has no limiting effect on the lawyer's liability to the client."[14] Ohio has noted that an arbitration provision does not limit malpractice liability because it "shifts resolution of the legal malpractice dispute from a court of law to a different forum."[15] The New York and Oklahoma ethics commissions have come to similar conclusions, although they also sensibly require the attorney to explain to the client the numerous distinctions between arbitration and court proceedings.[16]

The Ginters attempt to distinguish this authority by pointing out that arbitration is generally seen as beneficial to both sides because of its streamlined procedures. But the very fact that arbitration has such different procedures makes including an arbitration provision into an attorney-client agreement more, not less, objectionable. By agreeing to arbitration, clients are unlikely to

---

[14] CONN. BAR ASS'N, Ethics Op. 99-20, 1999 WL 958027, at *1 n.2.

[15] OH. BD. OF COMM'RS ON GRIEVANCES AND DISCIPLINE, Op. 96-9, 1996 WL 734408, at *4 (concluding that, while arbitration provision are not a limitation on malpractice liability, they should not be included in engagement letters because their inclusion violates an attorney's general duties to protect his or her "clients from agreements that do not serve the client's best interest").

[16] See OK. BAR ASS'N LEGAL ETHICS COMM., 2000 WL 33389634, at *2–*5, Op. No. 312 (determining that an arbitration clause is not a limitation on liability because it merely determines the forum in which a case will be litigated, but concluding that an attorney should advise the client about the differences between litigating in a court and arbitration); NY COUNTY LAWYERS' ASSOC. COMM. ON PROF'L ETHICS, Op. 723, 1997 WL 419331, at *2 (same).

be aware of the fact that they are waiving important rights, like the right to appeal and the right to a jury trial. Indeed, as noted above, the New York and Oklahoma ethics commissions have relied on this concern to conclude that their attorneys, before an including an arbitration clause in their fee agreements, must explain to their clients the substantial differences between arbitration and normal litigation. The differences between state and federal court, however, are not nearly as substantial. Thus, there is a much stronger case for upholding a forum-selection clause like the one at issue in this case than an arbitration clause, where the risk of an attorney's taking advantage of a client is greater.

From all of this we can distill a general rule that including a forum-selection clause into an attorney-client agreement is usually not a limitation on malpractice liability. Instead, it is only a limitation when the selected forum has rules expressly limiting liability or if litigating in that forum would be so unfair as to be a practical limitation on liability.

Here, there is no suggestion that litigating in Louisiana state court would result in an express limitation on liability—Louisiana substantive law will govern this dispute whether it is in federal or state court. The suggestion here is simply that Belcher would gain a subtle strategic advantage by being able to defend himself in state court. But the connection between that advantage and limiting liability is too remote to be considered a practical limitation on Belcher's liability. Perhaps if Belcher had selected a far-flung forum to discourage litigation, including the clause could be viewed as a limitation on liability. Belcher, however, has selected an entirely reasonable forum in light of the fact that the fee agreement at issue governed an adoption that would involve events that would take place mostly in Louisiana and would be governed by Louisiana law. The Ginters have not met their heavy burden to establish that the forum-selection clause here should be held unenforceable.

B.     Does the forum-selection clause govern the Ginters' tort causes of action?

The Ginters also argue that even if the forum selection clause is enforceable, it should not apply here because they have not sued for breach of contract—they have sued only under various tort theories. In Marinechance Shipping LTD. v. Sebastian, we faced a similar situation, where a litigant attempted to sidestep the reach of a contractual forum-selection clause by suing under causes of action sounding in tort.[17] In holding that the forum-selection clause covered the tort causes of action, we foreswore any slavish adherence to a contract/tort distinction; to hold to the contrary would allow a litigant to avoid a forum-selection clause with "artful pleading."[18] Instead, we examined the language of the forum-selection clause with a common-sense view of the causes of actions to determine whether the clause was broad enough to cover the torts.[19]

Here, the forum-selection clause at issue provides the following: "Any action at law, suit in equity, or other judicial proceeding for the enforcement and/or breach of this contract, or any provision thereof, shall be instituted only in the 19th Judicial District Court of the State of Louisiana." While the clause speaks of covering suits dealing with the enforcement or breach of the contract, the causes of action here all arise out of Belcher's contractual relationship with Ginters. Though their causes of action sound in tort, the Ginters are complaining about the failure of Belcher to fulfill his contractual obligations. We conclude that the suit is covered by the forum-selection clause.

In sum, we hold that the forum-selection clause in the attorney-client agreement between the Ginters and Belcher is enforceable and governs the tort

---

[17] 143 F.3d 216, 220–21 (5th Cir. 1998).

[18] Id. at 222 n.27.

[19] Id. at 222.

claims at issue in this case.  Accordingly, we REMAND the case to the district court with instructions that it be dismissed.

REVERSED.  Cause REMANDED.

DENNIS, Circuit Judge, dissenting:

I respectfully dissent. I would affirm the judgment of the district court in denying the defendant attorney's motion to dismiss because, under the facts viewed in the light most favorable to the non-moving parties, the forum-selection clause was a product of overreaching by the defendant attorney in that it and other provisions of the adoption and attorney-client contract were designed to favor the attorney's interests in pursuing his adoption agency business to the disadvantage of the interests of his clients, the plaintiffs.

I.

Lisa Marie and Paul Ginter ("the Ginters"), plaintiffs-appellees in this case, are residents of South Carolina. They are unable to biologically conceive and have children. As a result, the Ginters sought to adopt a newborn child. In March 2003, the Ginters learned that Belcher, a Baton Rouge, Louisiana attorney, could assist them in adopting an infant girl who had been rejected by another couple because the child was born with a bilateral cleft palate/lip. The Ginters proceeded to enter into a contract with Belcher for the placement and adoption of the infant girl with full knowledge of the birth defect. More than a year later, in August 2004, a representative of Belcher's law firm contacted the Ginters to inform them that the birth mother of the child that they adopted in 2003 was again pregnant and wanted to place her unborn child for adoption. Belcher had his assistant contact the Ginters for the adoption because the unborn child would be a half-sibling of their adopted child. According to the Ginters' complaint, "after much deliberation," they agreed to adopt the unborn child. However, because of the "financial and emotional toll" that the Ginters had incurred from the previous adoption due to that child's bilateral cleft palate/lip,[1] they agreed to adopt the unborn half-sibling only on the condition

---

[1] According to the Ginters' complaint, the older half-sibling "has special needs and has undergone several corrective surgeries with many more surgeries projected. The baby also

that the child was healthy at birth. The Ginters were concerned about their ability to adequately care for the second child if that child were also to be born with a disorder or defect.

On August 17, 2004, the Ginters entered into a contract with Belcher for the procurement and delivery for adoption of a "healthy Caucasian child" in Louisiana. Belcher prepared the adoption agreement which the Ginters signed. The agreement contained the following provisions:

> PAUL EDWARD GINTER and LISA MARIE GINTER agree to pay Fred H. Belcher, Jr. the sum of Twenty-Eight Thousand Seven Hundred Fifty and No/100 ($28,750.00) as payment for medical bills, hospital bills, living expenses of the biological mother during pregnancy and for a reasonable time afterwards, and attorney fees. This contract does not cover court costs for the adoption.

> PAUL EDWARD GINTER and LISA MARIE GINTER further agree they will pay $10,000.00 upon execution of this agreement, $10,000 forty-five (45) [days] prior to the anticipated due date and $8,750.00 upon receipt of the child.

> Should the child be born premature or for medical reasons, be required to stay in the hospital more than two days, the parents and/or their hospitalization insurance policy shall be responsible for the expenses incurred by the child for any stay in excess of two days.

> Fred H. Belcher, Jr. hereby guarantees he will procure and deliver to PAUL EDWARD GINTER and LISA MARIE GINTER a healthy Caucasian child from a biological mother.

> Should the adoptive parents withdraw from this agreement, they forfeit all monies deposited with Fred H. Belcher, Jr. This agreement cannot be assigned by either party.

---

receives therapy 3 times per week and will continue to do so for speech."

Fred H. Belcher, Jr. further guarantees the final adoption shall be legal.

Fred H. Belcher, Jr. further agrees that should the biological mother refuse to sign the consent papers for the adoption, or the adoption fails for any reason, he guarantees that PAUL EDWARD GINTER and LISA MARIE GINTER shall be placed with another pregnant biological mother, either through his or their joint efforts, within twelve (12) months of the date of refusal or a refund of one-third (1/3) all monies deposited with him. Should the adoptive parents, PAUL EDWARD GINTER and LISA MARIE GINTER be placed with a second biological mother and the biological mother refuses to sign the consent papers for the adoption or the adoption fails for any reason, the adoptive parents, PAUL EDWARD GINTER and LISA MARIE GINTER shall <u>not</u> receive a refund of any monies deposited with Fred H. Belcher, Jr.

Fred H. Belcher, Jr. further guarantees that PAUL EDWARD GINTER and LISA MARIE GINTER shall receive a healthy Caucasian child. He only guarantees the mental and physical health of the child for a period of thirty (30) days from date adoptive parents receive the child. He is not responsible for any of the child's medical bills from the time the child is removed from the hospital.

We, PAUL EDWARD GINTER and LISA MARIE GINTER, acknowledge that we have been advised by Fred H. Belcher, Jr. that the field of adoptions is a specialized and difficult area of practice due to the numerous laws in place to protect the rights of the biological parents including, but not limited to, specific waiting periods during which the final surrender cannot be executed. We understand that the surrender of the child cannot be finalized until the expiration of those waiting periods and that Fred H. Belcher, Jr. does not guarantee a successful result. We have further been advised that failed adoptions are a regular occurrence in this field and that there is a real risk that the adoption will not be finalized.

> It is mutually understood and agreed that this contract shall be governed by the laws of the State of Louisiana, and specifically by the Louisiana Children's Code both as to interpretation and performance. Any action at law, suit in equity, or other judicial proceeding for the enforcement and/or breach of this contract, or any provision thereof, shall be instituted only in the 19th Judicial District Court of the State of Louisiana.
>
> We, PAUL EDWARD GINTER and LISA MARIE GINTER, acknowledge that we have read this contract in its entirety and that we have been given the opportunity to ask questions. After having done so, we hereby acknowledge that we understand the terms, conditions and risks involved in entering into this contract and that we hereby accept all of the terms, conditions and risks outlined in this agreement.

(emphasis in original).

On December 5, 2004, Rachel Elizabeth Ballard was born at Women's Hospital in Baton Rouge, Louisiana. Through the actions of Belcher, she was then transferred to the care and custody of the Ginters on December 9. Four days later, Belcher advised the Ginters that they could leave Louisiana and return home to South Carolina with Rachel. Around this time, the Ginters learned for the first time that Rachel was not a "healthy Caucasian child," as provided for by the adoption agreement.

The Ginters allege that, on December 15, 2004, Belcher, pursuant to the Interstate Compact on the Placement of Children, submitted a required information packet, which included medical records of both Rachel and her biological mother regarding the treatment/services rendered at Women's Hospital from December 5 through December 8, to the Louisiana Department of Social Services. That packet was then forwarded to the South Carolina Department of Social Services on December 27, 2004. At the same time, however, the Ginters contend that, despite several requests, both at the time of

placement and thereafter, for Rachel's medical records, Belcher repeatedly advised the Ginters that he had not been provided Rachel's medical records. Additionally, the Ginters assert that, as a result of the medical issues associated with the adoption of their first child, they "repeatedly inquired as to the health of the birth mother" both before and after the birth and placement of Rachel. In response, they allege that they received "numerous representations" from Belcher and representatives of his firm that the birth mother had not consumed any drugs or alcohol during her pregnancy.

In March 2005, the South Carolina Department of Social Services informed the Ginters that it would not approve their adoption of Rachel because the Interstate Compact on the Placement of Children information packet did not contain a drug disclosure affidavit. Sometime thereafter, the Ginters learned that Rachel and her biological mother had both tested positive for illegal drugs at the time of Rachel's birth. More specifically, the mother tested positive for cocaine on December 5, 2004, the date of Rachel's birth, and Rachel tested positive for cocaine in her meconium (which is evidence of significant exposure) on December 6, 2004. As a result of the mother's drug and alcohol use during pregnancy, the Ginters state that Rachel suffers from fetal alcohol syndrome as well as other medical difficulties, including significant social, adaptive, motor skills, and communication impairments. Rachel now undergoes extensive therapy sessions because of the mother's use of drugs and alcohol during her pregnancy.

The Ginters brought this suit against Belcher alleging that he knew or should have known that Rachel's mother consumed drugs and alcohol during the pregnancy. They assert that Belcher owed them a duty to diligently represent them; to investigate the health of the mother during the pregnancy; to investigate the health/drug test results of the mother during the pregnancy and at the time

15

of Rachel's birth; to investigate the health/drug test results of Rachel at the time of her birth; and to disclose the health/drug test results of the mother and Rachel to the Ginters prior to placement of the infant with them. They further allege that Belcher failed in all of these respects, despite his having knowledge of and/or possession of the health/drug test results for the mother and Rachel, in an effort to mislead the Ginters so that they would accept placement of Rachel, who was neither Caucasian nor healthy.

Belcher then filed this motion to dismiss on the grounds that the amount-in-controversy requirement of $75,000 was not met and that the forum-selection clause in their adoption agreement precluded the Ginters from filing their suit anywhere but in the 19th Judicial District Court of the State of Louisiana. Belcher attached only a copy of the written agreement between the two parties in support of his motion. In opposition to Belcher's motion, the Ginters submitted, in addition to a copy of the written agreement, an e-mail from a representative of Belcher's law firm, a print-out of the December 6, 2004 drug test results for Rachel, an affidavit from the Ginters, and an excerpt of deposition testimony given by Belcher. Those documents constitute the entirety of the evidentiary record presently before us on appeal.

II.

While the majority opinion correctly states that we review a district court's decision to enforce a forum-selection clause de novo, see Haynsworth v. The Corp., 121 F.3d 956, 961 (5th Cir. 1997), it ignores the broader posture of this case. We are here on a motion to dismiss, one which Belcher brought at the very outset of this litigation pursuant to both Rule 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(3) (improper venue) of the Federal Rules of Civil Procedure. The district court, in denying Belcher's motion, did not distinguish between the two bases for Belcher's motion. The majority, in reversing the district court, also fails

to address this issue, perhaps mindful that this court on at least two previous occasions has declined to address the "enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under FED. R. CIV. P. 12(b)(1) [or] 12(b)(3) . . . ." Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 902 (5th Cir. 2005) (quoting Haynsworth, 121 F.3d at 961). Whatever the answer to that question, we need not resolve it in the context of this matter because I believe the conclusion remains the same regardless of whether the motion to dismiss is properly considered as a Rule 12(b)(1) or Rule 12(b)(3) motion. Our de novo review under either Rule 12(b)(1) or Rule 12(b)(3) requires us to view all the facts in a light most favorable to the plaintiff. See, e.g., Lane ex rel. Lane v. Halliburton, --- F.3d ---, 2008 WL 2191200, at *4 (5th Cir. May 28, 2008) ("In reviewing the dismissal order [under Rule 12(b)(1)], we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff."); Braspetro Oil Servs. Co. v. Modec (USA), Inc., 240 F. App'x 612, 615 (5th Cir. May 11, 2007) (unpublished) ("On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff.") (citing Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1138 (9th Cir. 2004)). Moreover, under both Rule 12(b)(1) and Rule 12(b)(3), the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments. See Lane, 2008 WL 2191200, at *4 ("[U]nder Rule 12(b)(1), the court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.") (internal quotation omitted); Murphy, 362 F.3d at 1138-40 (holding that, in the absence of

factual findings made by the district court based upon an evidentiary hearing, affidavits and other evidence submitted by the non-moving party in the content of a Rule 12(b)(3) challenge are to be viewed in the light most favorable to that party).

Accordingly, as I explain in full below, viewing the limited evidentiary record in the light most favorable to the Ginters, as we must do at this stage in the proceedings, it is erroneous to conclude on this record, as the majority does, that federal court is an improper venue for the Ginters' suit against Belcher and hence that their suit must be dismissed.

## III.

Forum-selection clauses are presumed enforceable in both diversity and federal question cases. See Haynsworth, 121 F.3d at 962. However, the presumption of enforceability may be overcome by a showing that the clause is "unreasonable under the circumstances." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972) (internal quotation omitted). Among the reasons a forum-selection clause may be considered unreasonable is when its incorporation into the agreement was the product of overreaching. See Haynsworth, 121 F.3d at 963. "Although there is some ambiguity as to the precise boundaries of what constitutes 'overreaching,'" we have previously defined "overreaching" as "that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." Id. at 965 & n.17 (quoting BLACK'S LAW DICTIONARY 1104 (6th ed. 1990)).[2] On the

---

[2] A more recent version of BLACK'S LAW DICTIONARY defines "overreaching" as either "[t]he act or an instance of taking unfair commercial advantage of another, esp. by fraudulent means." BLACK'S LAW DICTIONARY 1136 (8th ed. 2004)). The difference between the 2004 definition and the 1990 definition, whatever it may be, is immaterial here for, as I discuss infra, sufficient evidence has been presented to suggest that Belcher's conduct potentially constituted "overreaching" under either definition set forth in BLACK'S.

record currently before us, we are presented with a set of facts, which viewed in the light most favorable to the plaintiffs, shows that Belcher's conduct created a conflict of interest between him and his clients regarding his placement of a newborn child with them for adoption purposes, resulting in an inequality of bargaining power to the disadvantage of the Ginters during the formation of the adoption agreement.

The written contract and the evidence presented by the parties indicates that Belcher acted as both an adoption broker (or agency) and an attorney in his dealings with the Ginters. Belcher even admits as much. Most particularly, the transcript of Belcher's deposition testimony provides the following insight into Belcher's view of his relationship with the Ginters:

> Q. Let's talk about a couple of other issues here. The contract that you drew up, you admit that you drew up this contract, that it wasn't a give-and-take between you and the Ginters; am I correct?
>
> A. That's correct. This was the second time they had been through me. They had already seen this contract. This was their second baby.
>
> Q. And you acknowledge that you placed in here a provision . . . "It is mutually understood and agreed that this contract shall be governed by the laws of the State of Louisiana, and specifically by the Louisiana Children's Code, both as to interpretation and performance. Any action at law, suit in equity, or other judicial proceedings for the enforcement and/or breach of this contract, or any provision thereof, shall be instituted only in the 19th Judicial District Court of the State of Louisiana." You placed that provision in the contract, did you not?
>
> A. Yes, because, you see, all of the adoption proceedings go through the juvenile court, the Parish of East Baton Rouge, the State of Louisiana, and is governed by the code, the Children's Code of the State of Louisiana. Since they are out of state, you know, if something happens, I don't want to be going to South Carolina or Maryland or New Jersey, wherever it might be, so I said, Look – and I require them to

actually go through for the adoption, because I guarantee it is going to be legal that I do it. In fact, in this particular case, Ms. Ginter called to see if we would let her do the adoption through South Carolina right after it happened because she could do it in 90 days, and I said "No, Wendy, we need to do it because I want to be sure the adoption is done legally," because I guarantee the legality of it. So I put that in there because it's governed by the Children's Code, and the adoption goes through East Baton Rouge Parish, whether it's out-of-state or in-state. Like I said, 85 percent of my cases, or 80 to 85, are residents of the State of Louisiana. We don't cater to out-of-state people. Her best friend lived in Prairieville and that's how we met Lisa Ginter.

Q. Did you suggest to the Ginters before they signed this that they ought to consult their own legal counsel before they signed that agreement?

A. I assumed that when we did the first agreement that they were going to consult, because we e-mailed it and also mailed it, that they were going to consult their attorney to see did they want to sign it or they didn't want to sign it. He's a businessman and Mrs. Ginter was a businesswoman, so I assumed that when they signed their first one, that they consulted their lawyer.

Q. Okay, I'm asking you, did you specifically – do you specifically remember having a conversation with them –

A. No, I didn't talk to them about it.

Q. You didn't talk to them about that provision?

A. No.

Q. Okay. There is another provision in here, it says, "Fred H. Belcher further guarantees that Paul Edward Ginter and Lisa Marie Ginter shall receive a healthy Caucasian child. He only guarantees the mental and physical health of the child for a period of 30 days from date adoptive parents receive the child. He is not responsible for any of the child's medical bills from the time the child is removed from the hospital." Did I read that correctly?

A.    That's correct.

Q.    Okay.  Did you suggest to the Ginters that they should refer to other representation to determine whether that limitation of liability was an appropriate thing for them to sign off on?

A.    I just assumed that since they were business people, they were going to have – before they signed the first one, not this one – that they were going to have their attorney look it over and ask any questions.

Q.    Do you remember having a conversation with them about that limitation provision?

A.    I remember having a conversation about the whole contract with Lisa Ginter on the first one.  Now, I didn't talk to her about the second one, because I just told Wendy to call her and see if she wanted – we have a standard rule that if a biological mother comes back the second time, that we give the first parent, the first adoptive parents, no matter how many people we have waiting, the chance to adopt a half-sibling or a full sibling; and which Karen came back, and I asked Wendy, I said, 'Why don't you call Lisa and see if she wants this child?  If she doesn't, we will place it with somebody else.'  And she did.  So I had no contact with Lisa Ginter or her husband at all on the second adoption.

Q.    Okay.  Do you specifically remember having any conversation with them, either the first time or the second – well, not the second time – the first time about the fact that they ought to seek independent legal representation before they signed that contract?

A.    I'm sure –

Q.    I'm not asking you what you assumed.  I'm asking you, do you remember having that specific conversation?

A.    I can't recall, but I assume I told them to check with their attorney.

From this testimony, it seems clear that, from the outset of his relationship with the Ginters, Belcher sought to wear two different hats – one as their adoption

broker, another as their attorney – throughout its duration. For example, Belcher testified that he placed the forum-selection clause into the adoption agreement before he began acting as the Ginters' attorney to ensure that the Louisiana Children's Code would govern his actions in contracting to procure and deliver the Ginters a newborn child for adoption. But at the same time, the adoption agreement covered his attorney's fees and included a provision guaranteeing that "the final adoption shall be legal."[3] Moreover, even if we were to accept that Belcher acted as an adoption broker before he became the Ginters' attorney, Belcher still knew all along that, as part of the adoption agreement, he would provide legal services to the Ginters after he had negotiated and transacted his business as an adoption broker with them. In other words, his interest as a person in the adoption business was ongoing throughout the time he undertook to represent the Ginters as their attorney.

Belcher essentially concedes this point in his deposition. Had he viewed his relationship with the Ginters as exclusively an attorney-client relationship, there would have been no reason for Belcher to advise the Ginters to seek outside counsel, or at the very least, for Belcher to believe that the Ginters should or would obtain outside counsel prior to the execution of the agreement. Yet, in his deposition, Belcher stated that "I assume I told [the Ginters] to check with their attorney" before they signed the contract for their first adoption, and in at least two other answers, he explained that he assumed that they would consult with "their attorney." In addition, Belcher's description of how and why his firm handled the placement of the second child with the Ginters, i.e., that he personally

---

[3] There is no evidence that the $28,750, which was the total amount due to Belcher under the terms of the contract, did not also include compensation for the placement of a healthy baby with the Ginters and others services as an adoption facilitator (i.e., Belcher did not require a separate contract or fee for his adoption brokerage services).

did not contact the Ginters directly, that his firm had a policy regarding siblings and half-siblings of prior adoptees, that his firm had a "waiting" list, and that his firm would "place" the child with someone else if the Ginters did not want it, is further evidence that, at the very least, he viewed his relationship with the Ginters as some type of hybrid between that of a pure attorney-client relationship and that of an independent adoption agency transaction. Moreover, in his brief, Belcher frequently refers to the agreement as an "adoption agreement," not as an attorney-client agreement, and in fact states that "the bulk of the adoption agreement is no different then (sic) an agreement which might be signed with any adoption agency or charity." Again, this indicates (based on Belcher's own statements) that at various points during the Ginter-Belcher relationship Belcher's role was more like that of an independent adoption broker, even as he also purported, based on the terms of the agreement, to serve as the Ginters' counsel during the adoption proceedings.

The fact that Belcher appears to have worn two hats during the course of his relationship with the Ginters – that of their attorney and that of an independent adoption facilitator – is especially troublesome given that the record evidence, particularly the affidavit executed by the Ginters, suggests that they believed that they had consulted with Belcher solely for the purpose of retaining him as their counsel during the adoption proceedings. See Affidavit at ¶ A ("When they entered into discussions with Fred Belcher about the terms of his legal representation for the adoption of Rachel . . . ."). Certainly, the language in the agreement could be read to convey Belcher's intent to represent the Ginters as their counsel throughout the adoption process. For example, the agreement identifies Belcher as "attorney-at-law"; it states that the lump fee payable by the Ginters to Belcher includes "attorney fees"; it guarantees that "the final adoption shall be legal"; and it was signed by Belcher as a member of his law firm, Belcher

23

& Prendergast. If in fact the Ginters had a subjective belief that Belcher was to serve as their counsel, while at the same time Belcher believed that he was to serve at least in part as an independent facilitator of the adoption, then I do not understand how we can summarily conclude that Belcher did not overreach here, particularly in light of the fact that he included several provisions in the agreement that unquestionably favored him to some extent as an adoption agent vis à vis the Ginters on matters in which their interests were adverse. The forum-selection clause is but one example. The agreement also included provisions guaranteeing the mental and physical health of the child only for a period of 30 days from the date the adoptive parents received the child, eliminating Belcher's responsibility for any of the child's medical bills after the time the child is removed from the hospital, and stipulating that should the adoption fail for any reason, the Ginters would receive only 1/3 of their money back or credit for a second adoption try, the failure of which would result in the Ginters receiving no money back. Those provisions almost certainly were not intended for the Ginters' benefit, and appear to have no connection to the parties' purported attorney-client relationship. Rather, they seem designed to protect Belcher as an adoption broker in case something went wrong with the baby, not the legal aspects of the adoption.

To that end, the Louisiana Supreme Court has recognized that "there can be a potential for confusion when an attorney wears a multitude of hats." In re Austin, 943 So. 2d 341, 348 (La. 2006). Moreover, it has, as the majority points out, explained that

> [w]hen a lawyer enters into a business transaction with his client where they have differing interests and when the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer should at least advise the client to seek outside counsel. If the advice to seek outside counsel has not been given, or though given, has not been taken, then full disclosure would require the type of advice which a prudent lawyer

would be expected to give the client if the client consulted the lawyer regarding such a transaction to a third person.

La. State Bar Ass'n v. Bosworth, 481 So. 2d 567, 572 (La. 1986). These principles derive from two sources: Louisiana Rule of Professional Conduct 1.8(a)[4] and Disciplinary Rule 5-104(A) of the Canons of Professional Responsibility for the Louisiana State Bar Association.[5] Both the professional conduct rule and the disciplinary rule plainly contemplate a certain level of disclosure to the client about the attorney's possible dual role in the transaction that, at least from the record presently before us, does not appear to have been present in this case. Moreover, the professional conduct rule requires the attorney to advise his client to seek the advice of independent legal counsel on the transaction prior to entering into the transaction, which again did not happen here. Significantly, these

---

[4] Rule 1.8(a) states:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

[5] Disciplinary Rule 5-104(A) provides:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

Louisiana principles closely track accepted national standards on potential conflicts of interests between an attorney and a client. For example, the Restatement of the Law Governing Lawyers provides:

> A lawyer may not participate in a business or financial transaction with a client, except a standard commercial transaction in which the lawyer does not render legal services, unless:
> (1) the client has adequate information about the terms of the transaction and the risks presented by the lawyer's involvement in it;
> (2) the terms and circumstances of the transaction are fair and reasonable to the client; and
> (3) the client consents to the lawyer's role in the transaction under the limitations and conditions provided in § 122 after being encouraged, and given a reasonable opportunity, to seek independent legal advice concerning the transaction.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 126 (2008).

Against the clear weight of the mostly uncontroverted evidence presented thus far in this case, as well as the persuasive authority of both Louisiana and national principles governing attorney conduct in similar situations, the majority can only offer the summary conclusion that the forum-selection clause was not a product of overreaching. That conclusion appears to be predicated on the erroneous view that "all parties agree" that the agreement between the Ginters and Belcher was "merely an agreement consummating the attorney-client relationship." While that may have been the Ginters' understanding of the nature of their relationship with Belcher, as I have discussed, the written contract, the evidentiary record (limited as it may be at this stage) and Belcher's appellate brief suggest that Belcher did not possess such a narrow view of his relationship with the Ginters. Rather, taking Belcher at his own word, he seemed to view his role with respect to the Ginters as a hybrid of attorney to clients and broker to adoptive parents. Thus, I do not believe, on this factual record at least, that it is

accurate (or sufficient) to say "all parties agree that it is merely an agreement consummating the attorney-client relationship."

Furthermore, while recognizing the principles discussed in Bosworth and set forth in the Louisiana attorney conduct and disciplinary rules, the majority attempts to distinguish this case from Bosworth on the basis that the business transaction in Bosworth occurred after the formation of the attorney-client relationship, whereas the agreement at issue in this case was not a "separate business transaction," but instead purportedly consummated the attorney-client relationship. I find this distinction legally meaningless here because, as I have discussed, I do not believe that, at least from Belcher's standpoint, this was purely an attorney-client relationship. Rather, the principles set forth in Bosworth, as well as in the professional conduct rules, are fully applicable, in my view, to those situations in which an attorney enters into an agreement that, at the same time, is opaquely both the consummation of an attorney-client relationship and an independent business transaction. The "client" in this situations is just as vulnerable to an unfair transaction based on a mistaken belief that the attorney is acting solely to protect his interests as a client in a pre-existing attorney-client relationship who is involved in a subsequent business transaction. Accordingly, I see no reason why the application of either Bosworth or the professional conduct rules should be circumscribed based on a temporal distinction, and I do not find any authority explicitly compelling such a result.

IV.

Ultimately, we are here on a motion to dismiss, one which Belcher brought at the very outset of this litigation and, consequently, one in which we must view the facts in the light most favorable to the Ginters. Quite simply, the Ginters have presented sufficient, uncontroverted evidence that, when viewed in that light, fully supports the district court's determination that the forum-selection

clause is invalid as a product of overreaching by the attorney. Against state and national rules governing attorney conduct, Belcher failed to advise the Ginters that they should seek independent legal counsel before signing an adoption agreement that included clauses which protected Belcher as an adoption agent to the disadvantage of his clients, including the forum-selection clause, the limitations on Belcher's warranty as to the condition of the baby, and the restrictions on the amount of money the Ginters would receive in return if the adoption failed for any reason. I would therefore affirm the district court's denial of the motion to dismiss on this record.[6]

---

[6] Our finding that the forum-selection clause was a product of overreaching is sufficient ground to find it invalid as grounds for dismissal. Therefore, we need not reach the question of whether the enforcement of the clause here would violate Louisiana public policy on limitation of legal malpractice liability. Moreover, to the extent Belcher challenges our subject matter jurisdiction over this case, I have no difficulty concluding that the $75,000 amount-in-controversy requirement under 28 U.S.C. § 1332 has been met in this case. It is axiomatic that "unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938); St. Paul Reinsurance Co., Ltd. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998). "To justify dismissal, 'it must appear to a legal certainty that the claim is really for less than the jurisdictional amount.'" Id. (quoting St. Paul Mercury, 134 F.3d at 289). Here, the plaintiffs allege $800,000 in damages in their complaint. Given the allegations of breach of contract and tortious conduct on the part of Belcher, resulting in the Ginters' acceptance of a newborn child with significant health difficulties, it can hardly be said that the Ginters' claimed sum has not been made in good faith. Accordingly, Belcher's argument concerning federal court subject matter jurisdiction is without merit.